IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

GILBERTO LOPEZ-GIRALDO (2),
RAUL LOPEZ-GIRALDO (3),
GUILLERMO ESCOBAR (4),
ALEXANDER DUQUE-CASANOVA (6),

Defendants.

CRIMINAL ACTION NO.:

1:17-CR-395-MLB-JKL

## ORDER AND FINAL REPORT AND RECOMMENDATION

This criminal case is again before the Court on Defendants Gilberto Lopez-Giraldo, Raul Lopez-Giraldo, Guillermo Escobar, and Alexander Duque-Casanova's Joint Motion to Dismiss Indictment for Pre-Indictment and Post-Indictment Delay.[1] [Doc. 101.] In February 2021, I recommended that the motion be denied as to Defendants' request to dismiss the superseding indictment for pre-indictment delay, which the District Judge adopted. [Docs. 170, 187.] At that time, however, I deferred ruling on whether dismissal for post-indictment delay would be appropriate until an evidentiary hearing could be conducted. [Doc. 170.]

_____

[1] A fifth defendant, Harby Mayor-Mejia, has not been arrested and remains at large.

Over two days in March and June 2021, I held an evidentiary hearing on post-indictment delay.[2]  Assistant United States Attorney Nicholas N. Joy, the lead prosecutor on the case since August 2017, testified for the government as its sole witness.[3]  Defendants called one witness, Monica Rincon, a Colombian attorney who represented all four Defendants as they were awaiting extradition in Colombia following their arrest on the charges in this case; she is also married to Duque-Casanova.  (Tr. 235.)

Following the conclusion of the hearing, Defendants filed post-hearing briefs in support of their motion to dismiss this case for post-indictment delay.  [Docs. 213, 215, 216, 217.[4]]  Defendants also moved to renew their request for pre-

_____

[2] The transcript of the hearing is split between two volumes, with day one docketed at Doc. 182 (pp. 1-164) and day two at Doc. 209 (pp. 165-262).  Because the page numbers run sequentially between these two volumes, I refer to specific portions of the transcript simply as "Tr. __."  I also refer to exhibits from the hearing are referred as "Gov't Ex." and "Def. Ex."  The exhibits are available at Docs. 198 (Gov't Ex. 15), 200 (Def. Exs. 1-7A), 208 (Def. Exs. 1A-4A); and 227 (Gov't Exs. 1-12).

[3] Two AUSAs who were previously uninvolved in this case, Laurel Boatright Milam and Tyler Mann, appeared for the limited purpose of handling the motion to dismiss for post-indictment delay.

[4] A duplicate version of Gilberto Lopez-Giraldo's response brief is docketed at Doc. 214.  I refer to the version docketed at Doc. 213 throughout this report and recommendation.  The Clerk is **DIRECTED** to redocket Doc. Entry 214 as a supplement brief to Doc. Entry 101.

2

indictment delay based on evidence elicited during the hearing.  [*See* Doc. 213 at 4; Doc. 215 at 2 n.1; Doc. 216 at 2; 217 at 1 n.1.]  The government has filed an omnibus response [Doc. 218], and Defendants have filed replies [Docs. 225, 226, 229, 230].  For the reasons that follow, it is **RECOMMENDED** that Defendants' requests to dismiss the indictment for pre-indictment and post-indictment be **DENIED**.[5]

## I.    BACKGROUND

This case arises out of two parallel money laundering investigations conducted by Homeland Security Investigations ("HSI") agents in Chicago and Atlanta.  (Tr. 22.)  The Chicago investigation, which ran from the end of 2010 through 2012, was primarily focused on Escobar, who was suspected of laundering Colombian drug proceeds into the United States by exchanging Colombian pesos for United States drug dollars.  (Tr. 24.  *See generally* Gov't Ex. 12 at Ex. 5 (Aff. of J. Shaun Kicklighter) ¶¶ 7, 8, 27, 28.[6])  The Atlanta investigation, meanwhile,

_____

[5] Also pending before the Court are Gilberto Lopez-Giraldo's, Duque-Casanova's and Escobar's motions to withdraw their respective motions to suppress.  [Docs. 219, 220, 221.]  Those motions are **GRANTED** and their motions to suppress [Docs. 104, 108, 116] are **WITHDRAWN**.

[6] The government submitted an affidavit from HSI Special Agent J. Shaun Kicklighter in support of its request to extradite Defendants, which was admitted into evidence as Government Exhibit 12.  [*See* Doc. 227-13 at 43-65.]  SA

involved coordinating alleged money pickups by a cooperating source ("CS") on February 16, 2012; February 28, 2012; March 7, 2012; May 21, 2012; August 27, 2012; November 21, 2012; July 2, 2013; and November 19, 2014.  (Kicklighter Aff. ¶ 26.)  The main target and lead contact with the government's CS in the Atlanta investigation was Juan Pablo Lozada-Franco.  (Tr. 37, 130).

According to an HSI report dated November 2013, prosecutors in the Northern District of Georgia expected to obtain indictments in early 2014 against Lozada-Franco and other targets of the Atlanta investigation—including Gilberto Lopez-Giraldo, Raul Lopez-Giraldo, and Duque-Casanova, as well as a Moises Lopez-Carmona—all of whom were suspected money brokers for a drug cartel and Colombian nationals who lived in Cali, Colombia.  [*See* Doc. 112-1.]  Later HSI reports dated February 6, 2014 and March 31, 2014, similarly anticipated that the indictment would be obtained within months.  [Docs. 112-2, 112-3.]

No indictment was obtained in 2014.  Even so, agents continued to perform some investigatory work in 2015 and 2016.  For example, in March 2015, they obtained a search warrant for an email account associated with Escobar that was

---

Kicklighter's affidavit provides a brief summary of the Chicago and Atlanta investigations.  [*Id.*]

tied to the proceeds of the final alleged money laundering transaction in November 2014. (Tr. 150.) Then, in June 2016, Gilberto Lopez-Giraldo's phone was searched when he entered the United States.  (Tr. 152.)  However, nothing that the government seized from either Escobar's email account or Gilberto Lopez-Giraldo's phone was ever presented to the grand jury.  (Tr. 177, 193.)  The government also obtained Raul Lopez-Giraldo's phone number (Tr. 195), and in September 2015, an informant told investigators that Lozada-Franco had been diagnosed with cancer and was undergoing chemotherapy [Doc. 112-4 at 3].

In August 2017, AUSA Joy was assigned to handle the case.  (Tr. 57-58, 125.)  He quickly realized that the five-year statute of limitations for the alleged November 2012 money laundering transactions was about to expire. (Tr. 125.) To stop the clock, he obtained an indictment on November 14, 2017, charging Lozada-Franco, Gilberto Lopez-Giraldo, Raul Lopez-Giraldo, and Escobar with (1) concealment of money laundering the proceeds of drug sales in violation of 18 U.S.C. § 1956(a)(1)(B)(i)—with respect to eighteen transactions that occurred between November 23 and November 29, 2012; and (2) laundering more than $10,000 in violation of 18 U.S.C. § 1957—in connection with three transactions that took place on November 26, 27, and 28, 2012.  [Doc. 1 at 1-5.]  By AUSA

5

Joy's admission, this indictment was a "placeholder" because, with the investigation ongoing, he anticipated superseding it to indict additional defendants and bring additional charges.  (Tr. 16, 90, 110-111.)  The indictment was sealed out of concern, first, that if any of the defendants learned of the charges, they would seek to avoid apprehension; and second, for the safety of cooperating sources who had participated in the investigation.  (Tr. 16-17.)

In anticipation of obtaining the indictment, in October 2017, AUSA Joy contacted the Office of International Affairs ("OIA"), a department within the Department of Justice tasked with handling extradition requests, and asked for information about the extradition process from Colombia.  (Tr. 17.)  At some point thereafter, OIA provided extradition forms to AUSA Joy.  (*Id.*)  Then, on January 12, 2018, he followed up with OIA to make sure that he had the current version of extradition forms and that he understood the extradition process.[7]  (Tr. 20-21.)

Around the time that he obtained the indictment in late 2017, AUSA Joy also communicated with agents involved in the Chicago investigation about adding defendants to the superseding indictment.  (Tr. 23-25.)  On February 21, 2018, HSI Chicago agents flew to Atlanta and met with AUSA Joy.  (Tr. 22-25.)  The agents

---

[7] This was AUSA Joy's first extradition from Colombia.  (Tr. 20-21.)

6

provided AUSA Joy with voluminous discovery from their investigation.  (Tr. 25.)

AUSA Joy reviewed it to determine whether to add additional defendants.[8]  (*Id.*)

In late May 2018, AUSA Joy and three HSI agents traveled to Bogota,

Colombia to meet with Colombian officials about the investigations.  (Tr. 27, 30.)

Preparation for the trip required several weeks of coordination with Colombian law

enforcement about whether the meeting would take place in Colombia or the United

States, who would attend the meeting, and when it would take place.  (Tr. 27-28.)

AUSA Joy and the agents also had to obtain travel authorization and funding.  (Tr.

28.)  The meetings themselves took place over a couple of days in May.  (Tr. 30.)

Among other things, the Colombian officials presented evidence—consisting

mostly of recorded phone conversations—concerning other individuals that they

wanted the United States government to indict, including Duque-Casanova.  (Tr.

30.)  The recordings were in Spanish, so AUSA Joy had one of the American law

enforcement officers translate them in real time.  (Tr. 30.)  AUSA Joy also asked

for copies of the recordings, which could be translated into English and used for

---

[8] This was not the only case AUSA Joy was handling.  For instance, in March 2018, with only three weeks' notice, he was required to prosecute a trial in a complex wiretap case, which took place between April 16 and 18, 2018, and involved 18 witnesses.  (Tr. 26.)

prosecutorial review.  (Tr. 30-31.)  The Colombian officers provided copies of the recordings on a CD; however, AUSA Joy and American law enforcement were unable to access the files and had to request them again.  (Tr. 32.)  In addition, Colombian law enforcement insisted on a copy of a Mutual Legal Assistance Treaty ("MLAT") documents prior to providing discovery about Mayor-Mejia, since he had not originally been a target of the Atlanta investigation.[9]  (Tr. 33-34.)  Between the various delays, it was not until August of 2018 that the government received the recordings and was able to have them translated into English.  (Tr. 32.)

Then, in September 2018, AUSA Joy learned that Lozada-Franco had died.  (Tr. 37, 69.)  Because he was the lead target of the Atlanta investigation, the government viewed his death as a "setback" for the prosecution.  (Tr. 37-38.)  AUSA Joy was also concerned that the defendants would later argue that his death "had speedy trial implications."  (Tr. 38.)  As a result, AUSA Joy accelerated his review of the evidence, completed the superseding indictment, and requested the most current extradition paperwork from OIA.  (Tr. 38-39.)  He also updated an internal memorandum and superseding indictment, which required supervisory approval that typically takes several weeks.  (Tr. 40-41.)

---

[9] He was initially part of the Chicago investigation.  (Tr. 33-34.)

On November 6, 2018, the government obtained a superseding indictment, which dropped Lozado-Franco and added Duque-Casanova and Mayor-Mejia as defendants.  (Tr. 41.)  [*See also* Doc. 18.]  The superseding indictment also added a conspiracy count, which alleged that between October 26, 2010 and November 25, 2014, the defendants conspired to launder proceeds of drug sales, in violation of 18 U.S.C. § 1956(h).  [*Id.* at 6-7.]  The conspiracy charge alleged a time period of criminal conduct that began at the start of the conduct in the Chicago investigation and ended with the final transactions in November 2014 in the Atlanta investigation.  [*Id.*]  (Tr. 42, 129.)  Arrest warrants were issued by a Magistrate Judge the following day.  (Tr. 43.)

On November 14, 2018, OIA submitted provisional arrest paperwork to the State Department.  (Tr. 43.)  Two weeks later, on November 29, 2018, the State Department sent the paperwork to the United States Embassy in Colombia.  (Tr. 43-44.)  Embassy officials then presented the paperwork to the Columbian government on December 13, 2018.  (Tr. 44.)  Upon hearing from HSI agents that Colombian officials had approved the provisional arrests, on January 23, 2019, AUSA Joy contacted OIA, who confirmed that he had authorization to work with Colombian law enforcement to arrest Defendants.  (Tr. 44.)

9

With approval granted, HSI agents worked with Columbian law enforcement to arrest Defendants.   Because Defendants lived in Cali, Colombian law enforcement had to use a specialized unit consisting of agents—some of whom had to travel from as far away as Bogota—who had been vetted to ensure that they were free from corruption and could be trusted.  (Tr. 46.)  Colombian law enforcement then conducted surveillance and prepared for a coordinated operation to arrest Defendants simultaneously.  (*Id.*)  On March 6, 2019, Defendants Gilberto Lopez-Giraldo and Raul Lopez-Giraldo were arrested at an airport in Cali as they returned from Barranquilla, Colombia.  (Tr. 47.)  Defendants Escobar and Duque-Casanova, meanwhile, were each arrested at different areas within Cali.  (*Id.*)  In all, approximately ten to fifteen Colombian law enforcement agents were involved in the arrests.  (*Id.*)  Once Defendants were in custody, HSI agents then traveled to Colombia to interview them.  (Tr. 48.)

Following the arrests, the United States government had sixty days to submit the final extradition documents and affidavits to the Colombian government.  (Tr. 50.)  Additionally, OIA approval was required before the documentation could be provided.  (*Id.*)  AUSA Joy swore out an affidavit in support of the extradition requests on April 9, 2019, slightly over a month after the arrests.  (Tr. 50-51.)

Also in April 2019, the Colombian government began detaining Defendants at La Picota, a prison infamous for its deplorable conditions. (Tr. 76, 212, 228, 231.)  At the time (and throughout the extradition process), all four Defendants were represented by Monica Rincon, Duque-Casanova's wife. (Tr. 209, 235.)  In late August 2019, with the help of her stepfather acting as interpreter, Rincon called AUSA Joy to discuss expediting Defendants' extradition to the United States. (Tr. 225.)  AUSA Joy explained that he was interested in expediting their extradition and would send law enforcement agents to speak to Defendants at La Picota. (Tr. 228.)  AUSA Joy did not, however, say anything about acting to speed the Colombian government's processing of their extradition. (Tr. 245.)  In the end, too, no HSI agents travelled to Colombia to interview Defendants. (Tr. 227.)

Around this time, AUSA Joy also had communications with other lawyers for Defendants, Paul Melvin and Ray Monsolillo, about negotiating a plea agreement. (Tr. 53.)  AUSA Joy also broached the subject of Defendants waiving or expediting extradition with them. (Tr. 53.)

In October 2019, Rincon finally filed paperwork to expedite the Defendants' extraditions with the Colombian Supreme Court of Justice. (Tr. 212-13.)  In Rincon's experience, it usually took between two and three months for defendants

to arrive in the United States after filing paperwork to waive extradition. (Tr. 248.) While the requests for expedited extradition were pending, Rincon became concerned that extradition was taking longer than expected; however, she still did not reach out to officials with the Colombian government or to AUSA Joy to express her concerns, and in fact took no other action to speed up the process. (Tr. 249-50.)

Ultimately, the Colombian authorities approved the extraditions. Defendants Raul Lopez-Giraldo, Escobar, and Duque-Casanova arrived in the United States on February 20, 2020, and had their initial appearances before a Magistrate Judge in this District on February 26, 2020. (Tr. 52.) Gilberto Lopez-Giraldo arrived in the United States on March 6, 2020, and had his initial appearance in this District later that day. (*Id.*) On July 13, 2020, Defendants filed their Joint Motion to Dismiss the Indictment for Pre-Indictment and Post-Indictment Delay. [Doc. 101.] As discussed, although motion has already been denied as to Defendants' request to dismiss the superseding indictment for pre-indictment delay [Docs. 170, 187], Defendants have renewed their request after the evidentiary hearing [*see* Doc. 213 at 4; Doc. 215 at 2 n.1; Doc. 216 at 2; 217 at 1 n.1]. The Court addresses their arguments on delay below.

## II.    DISCUSSION

In its analysis, the Court first takes up Defendants' renewed request to dismiss he indictment due to pre-indictment delay, and then addresses their arguments for dismissal due to post-indictment delay.

### A.    Defendants' Renewed Request for Dismissal Due to Pre-Indictment Delay

"Although the limit on pre-indictment delay is usually set by the statute of limitations, the Due Process Clause can bar an indictment even when the indictment is brought within the limitation period." *United States v. Lamb*, 214 F. App'x 908, 912 (11th Cir. 2007) (citing *United States v. Foxman*, 87 F.3d 1220, 1222 (11th Cir. 1996)).  To establish a due process violation based on the government's delay in bringing an indictment a defendant must "establish both (1) that the delay actually prejudiced his defense and (2) that it resulted from a deliberate design by the government to gain a tactical advantage over him."  *United States v. Farias*, 836 F.3d 1315, 1325 (11th Cir. 2016); *see also United States v. Wetherald*, 636 F3d 1315 (11th Cir. 2011) (quoting *United States v. Lindstrom*, 698 F.2d 1154, 1157 (11th Cir. 1983)).  "This standard is 'an exceedingly high one.'"  *United States v. Butler*, 792 F.2d 1528, 1533 (11th Cir. 1986) (quoting *Tiemens v. United States*, 724 F.2d 928, 929 (11th Cir. 1984)).

The Court previously addressed—and rejected—the arguments that Defendants make in support of their renewed request to dismiss for pre-indictment delay, and after hearing the evidence presented at the evidentiary hearing, I see no reason to depart from those findings. Defendants continue to complain that their ability to present a defense is prejudiced because they lack records that might show the legitimacy of their businesses and the transactions at issue in this case. [Doc. 213 at 6-7; Doc. 215 at 8-9; Doc. 216 at 9; Doc. 217 at 11.] But their argument remains far too generalized to meet their burden to show that their defense has been prejudiced. "Actual prejudice and not merely 'the real possibility of prejudice inherent in any extended delay,' must be demonstrated." *United States v. Barragan*, 752 F. App'x 799, 801 (11th Cir. 2018) (quoting *Stoner v. Graddick*, 751 F.2d 1535, 1544 (11th Cir. 1985)) (alteration adopted). "Thus, a general allegation of loss of witnesses and failure of memories is insufficient to demonstrate the actual prejudice required." *Id.* (cleaned up; citation omitted); *see also United States v. Holland*, No. 1:17-CR-00234-AT-CMS, 2018 WL 8838858, at *6 (N.D. Ga. July 27, 2018) ("Neither has he provided any specificity regarding the documents. These sorts of speculative assertions do not meet the actual prejudice standard."), *report and recommendation adopted*, 396 F. Supp. 3d 1210

14

(N.D. Ga. 2019). And because their arguments remain too conclusory, Defendants have also failed to "demonstrate that the evidence thereby lost could not be obtained through other means." *United States v. Corbin*, 734 F.2d 643, 648 (11th Cir. 1984).[10]

Defendants also continue to argue that they have been prejudiced by Lozada-Franco's death. But, as before, Defendants simply argue by assertion that Lozada-Franco might have provided exculpatory testimony had he been available for trial. Defendants still do not show what they would have expected him to say, nor do they offer any reason to believe that he would have even testified at trial if he were still alive, much less that he would have provided exculpatory information. [*See* Doc. 215 at 9; Doc. 216 at 10; Doc. 217 at 11-12.] Thus, the undersigned remains of the firm belief that Defendants' argument simply assumes that Lozada-Franco would have provided testimony favorable to Defendants, begging the question of

_____

[10] Raul Lopez-Giraldo and Escobar complain, somewhat more specifically, that the government did not request records from Defendants' businesses as part of the investigation and "the absence of records legitimizing their former businesses" has prejudiced them. [Doc. 216 at 9; Doc. 217 at 11.] The government cannot be faulted, however, for not requesting documents directly from a target of an investigation because when it would tip the target off to the investigation and he could flee or destroy evidence. (*See* Tr. 143 (explaining limitations in subpoenaing documents from target of investigation).)

15

how his death might have prejudiced them.  *See Corbin*, 734 F.2d at 648 (finding death of witnesses insufficient to show actual prejudice where defendants did not proffer what the witnesses would have been able to testify to and whether the substance of such testimony was otherwise unavailable).

Defendants separately argue that they have been prejudiced because of the way in which the government has charged this case.  Gilberto Lopez-Giraldo argues that the "Government deliberately delayed the indictment in order to get a potentially higher sentence both through an increased maximum sentence exposure as well as consecutive sentences."  [Doc. 213 at 7.]  Defendants Raul Lopez-Giraldo and Escobar similarly contend that the delay in seeking indictment was to conduct further investigation to add a conspiracy charge, which allowed the government to allege conduct that was outside the statute of limitations and gain a tactical advantage.  [Doc. 216 at 9; Doc. 217 at 11.]

These arguments are not persuasive.  As an initial matter, Defendants have not explained how any delay—in and of itself—served to increase the potential sentences that they might face in this case; they simply complain that the superseding indictment had additional charges.  But as evidenced at the hearing, AUSA Joy obtained the superseding indictment soon after traveling to Colombia

16

to meet with local law enforcement and collect evidence. "Delays resulting from government undertaking additional investigation or from the government directing resources to other cases [] do not demonstrate that the government delayed the indictment in order to gain tactical advantage." *Barragan*, 752 F. App'x at 801 (collecting cases). Moreover, even taking Defendants' theory at face value—that the government had no need to investigate potential charges to be added to the superseding indictment and that AUSA Joy simply delayed adding them for tactical purposes[11]—it becomes clear that the delay itself would not have served to change any of the charges set forth or add potential penalties since they were always available.[12] In other words, the evidence tends to show that the delay in this case was the result of legitimate administrative and investigatory decisions; but even considering Defendants' counterfactual position that further investigation was

---

[11] There is no evidence that this is true, only Defendants' speculation, and indeed, Raul Lopez-Giraldo and Escobar later admit that the investigatory efforts resulted in the conspiracy charges. [Doc. 216 at 9; Doc. 217 at 11.]

[12] Gilberto Lopez-Giraldo cites *Farias* and *United States v. Hayes*, 40 F.3d 362 (11th Cir. 1994), to support his argument that he was prejudiced because the government delayed the indictment to subject him to a potentially higher sentence is misplaced. [Doc. 213 at 7.] These cases say no such thing and, in fact, in both cases, the Eleventh Circuit found that the defendants failed to demonstrate prejudice due to pre-indictment delay. *Farias*, 836 F.3d at 1325; *Hayes*, 40 F.3d at 365.

always unnecessary, there is nothing to show that the delay itself served to increase the charges contained in either indictment.

Because Defendants have not made a showing that they were actually prejudiced by the pre-indictment delay, the Court's analysis need not go further. Accordingly, that Defendants' renewed requests for dismissal for pre-indictment should be denied.

### B.   Motion to Dismiss for Post-Indictment Delay

Turning to post-indictment delay, the Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial."  U.S. Const. amend. VI.  To determine whether a defendant's constitutional right to a speedy trial has been violated, courts use a four-factor test derived from *Barker v. Wingo*, 407 U.S. 514, 530 (1972), weighing (1) the length of the delay, (2) the government's reasons for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) the prejudice to the defendant.  *See United States v. Oliva*, 909 F.3d 1292, 1298 (11th Cir. 2018); *United States v. Dunn*, 345 F.3d 1285, 1296 (11th Cir. 2003).  If the first three factors "weigh heavily against" the government,

the defendant need not show *actual* prejudice, but if he cannot, dismissal is inappropriate. *United States v. Ingram*, 446 F.3d 1332, 1336 (11th Cir. 2006).[13]

## 1.  Length of Delay

The first *Barker* factor, the length of the delay, serves as a "double enquiry." *Villarreal,* 613 F.3d at 1350 (quoting *Doggett v. United States*, 505 U.S. 647, 651 (1992)).  First, it operates as "a triggering function:  it must first be satisfied for the court to analyze the other factors."  *Oliva*, 909 F.3d at 1298.  To do so, "the defendant must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from presumptively prejudicial delay." *Villarreal*, 613 F.3d at 1350 (citations and quotation marks omitted).  Though the length of delay is a fact-intensive inquiry, "delays exceeding one year are generally found to be 'presumptively prejudicial.'" *United States v. Clark*, 83 F.3d 1350, 1352 (11th Cir. 1996) (citation omitted).  In addition to its gatekeeping function, this factor also "examines 'the extent to which the delay stretches beyond the bare minimum needed' to satisfy the threshold showing of presumptive prejudice." *Villarreal*, 613

---

[13] "The Speedy Trial Act, 18 U.S.C. §§ 3161-74, provides further protections to ensure defendants receive a speedy trial." *United States v. Villarreal,* 613 F.3d 1344, 1349 n.3 (11th Cir. 2010).   Since Defendants present only a Sixth Amendment challenge in this case, the Speedy Trial Act is "not at issue here." *Id.*

F.3d at 1350 (quoting *Doggett*, 505 U.S. at 652). "The longer the pretrial delay extend[s] beyond the 'bare minimum' necessary to show presumptive prejudice, the stronger the presumption [is] that the pretrial delay prejudiced the defendant." *Id.* (quoting *Doggett*, 505 U.S. at 652).

The government first argues that period in this case is not presumptively prejudicial. In making that argument, it contends that the period of potential delay runs from when Defendants were indicted to March 2019, but that the Court should not consider the near twelve-month period following their arrests because that delay was occasioned by the extradition process and outside the control of the United States government. [Doc. 218 at 14-15.] The government then argues that, separately, Duque-Casanova cannot show presumptive prejudice because he was first indicted on November 6, 2018, and arrested on March 6, 2019—a gap of only four months, which is well under the one-year presumptively-prejudicial limit. [*Id.* at 14.] And for the remaining defendants, the government argues by assertion that the pre-arrest delay in this case is not presumptively prejudicial because they were arrested just shy of one year and four months after the initial indictment was returned in November 2017 (implying that the remaining period should not be considered). [*Id.* at 15.]

20

The Court disagrees.  The salient period is not just the time between when the indictments were returned and Defendants' arrests; the length of delay is measured from "the date of the indictment and the trial date." *Ingram*, 446 F.3d at 1337 n.3; *see also Oliva*, 909 F.3d at 1306 n.15 (recognizing that relevant period for determining length of post-indictment delay was time between when defendants were indicted and when the court ruled on their motion to dismiss, rather than gap between indictment and arrest); *Lamb*, 214 F. App'x at 913 ("In determining whether a delay is presumptively prejudicial, this court has measured the length of the delay from the date of indictment to the date of trial.").[14]  Thus, to calculate the length of pretrial delay, the Court must look at "the time that elapsed between 'when the Sixth Amendment right attached until trial (or, until the pretrial motion to dismiss on this ground is determined).'"  *Villarreal*, 613 F.3d at 1350 (quoting 5 Wayne R. LaFave, *et al.*, Crim. Proc. § 18.2(b)).  Accordingly, for Gilberto Lopez-Giraldo, Raul Lopez-Giraldo, and Escobar, that period is approximately

---

[14] Of course, a delay of a year or more between indictment and arrest may alone be considered presumptively prejudicial and require the Court to consider the remaining *Barker* factors.  *See*, *e.g.*, *Doggett*, 505 U.S. at 652 (finding eight-and-a-half year gap between indictment and arrest triggered speedy trial analysis); *United States v. Lamar*, 562 F. App'x 802, 805 (11th Cir. 2014) (42-month lag between indictment and arrest triggered analysis).

four years (November 2017 to November 2021), and for Duque-Casanova it is approximately three years (November 2018 to November 2021).  And since the post-indictment delay for each Defendant extends far beyond one year, they have met the threshold requirement of showing prejudicial delay.[15]

The second part of the "double enquiry" on delay requires the Court to determine how heavily to weigh the length of the delay against the government. *See Villarreal*, 613 F.3d at 1350.  That calculation, then, is largely a function of the length:  "The length of delay itself weighs against the government, incrementally increasing in weight as the delay becomes increasingly protracted, and a particularly lengthy delay may also affect [the Court's] analysis of the fourth Barker factor."  *Id.* (citing *Doggett*, 505 U.S. at 652).

Here, Defendants argue that the delay was protracted, and that it is appropriate to consider not merely post-indictment delay, but also the pre-indictment delay starting in November 2014, the last date of any relevant criminal activity on which the indictment is based.  On this point, Duque-Casanova argues

---

[15] The government's argument that Defendants' time spent in Colombian custody awaiting extradition should be deducted from the post-indictment delay is more appropriately addressed under the second and third *Barker* factors.  *See* 5 Wayne R. LaFave, *et al.*, Crim. Proc. § 18.2(b).

that the pre-indictment delay was inordinate because the last date of any relevant act in the investigation occurred in November 2014, and a four-year delay is "clearly inordinate." [Doc. 215 at 13-14.] Defendants Raul Lopez-Giraldo and Escobar, meanwhile, argue that the government could have indicted this case earlier and point out that AUSA Joy admitted that he could have charged the conspiracy in November 2017, rather than a year later. [Doc. 216 at 9; Doc. 217 at 11.] As for the government's investigatory efforts after 2014, Defendants contend that they were relatively minimal, consisting of a search of an email account in 2015 and a border search of a cellphone in 2016, which, Defendants maintain, do not provide adequate justification for the delay. [Doc. 216 at 9, 12-13; Doc. 217 at 11, 14.] Defendants Raul Lopez-Giraldo and Escobar additionally point out that the delay in seeking indictment was to conduct further investigation to add a conspiracy count and charge conduct outside the statute of limitations—thus gaining a tactical advantage. [Doc. 216 at 9; Doc. 217 at 11.]

The government counters that the length of delay should not weigh heavily against it, largely because the case involved "an investigation of a complex, international money laundering conspiracy being conducted by three sets of agents in three cities across two countries." [Doc. 218 at 16.] The government further

points out that Defendants Gilberto Lopez-Giraldo, Raul Lopez-Giraldo, and Escobar were arrested less than one year and four months after the initial indictment; that Defendant Duque-Casanova was arrested four months after he was indicted; and that despite being located in Colombia, Defendants' extradition took less than a year. [*Id.* at 16-17.]

While the Court grants that the investigation, charging, arrests, and extradition in this case were complex, the delay was still substantial and will weigh heavily against the government.   For starters, government's reliance on the complexity of these charges only gets it so far, and the Court will consider the pre-indictment delay as part of the overall delay.  *See Lamb*, 214 F. App'x at 914 (cleaned up) (quoting *Ingram*, 446 F.3d at 1339) ("[O]nce the Sixth Amendment's speedy trial analysis is triggered, it is appropriate to consider inordinate pre-indictment delay in determining how heavily post-indictment delay weighs against the Government.").[16]  While it is true that "[c]ourts tolerate delay less in the investigation of ordinary street crimes as compared to 'a serious, complex

---

[16] In determining whether a pre-indictment delay is "inordinate" for purposes of the determining how heavily to weigh the length of delay under the first *Barker* factor, the Court must consider the reasons for the pre-indictment delay.  *Lamb*, 214 F. App'x at 914.  Those reasons are also relevant to the second *Barker* factor— the reasons for delay—which will be addressed in Section II.B.2. below.

conspiracy charge,'" *United States v. Reyes*, No. 14-20209-CR, 2019 WL 2106422, at *8 (S.D. Fla. May 14, 2019) (quoting *Oliva*, 909 F.3d at 1304), the government does not explain *why* it took almost three years to obtain the first indictment, and there is evidence in the record that strongly suggests that the government could have indicted this case earlier than November 2017 and charged the conspiracy earlier than November 2018.  And as Defendants highlight, the only two additional investigatory steps the government took after the final criminal act (in furtherance of the conspiracy) were when the government obtained a search warrant for an email account allegedly used by Escobar and agents performed a border search of Gilberto Lopez-Giraldo's cell phone when he entered the United States.  (*See* Tr. 150-52.)  But the government does not explain how either of those steps was necessary to the overall investigation or charging decisions, especially since none of the evidence obtained was presented to the grand jury and there is no indication that the government actually felt that it needed to pursue these investigatory leads before charging these Defendants.  But even if these steps were necessary (or at least important), the government does not explain why nearly a year and a half elapsed between the border search in 2016 and when the initial indictment was returned in 2017.  This lack of explanation stands in stark contrast to the detail the

government has provided in other cases where it relies on pre-indictment investigative steps to justify the time it took to obtain an indictment. *See, e.g., Oliva,* 909 F.3d at 1305 (describing investigation to include "twenty-five witnesses located throughout numerous states, nine suspects, almost 100 exhibits, several search warrants, shoe-tread analysis, and more," and stating that agents were collecting pertinent evidence less than six months before the indictments were returned"); *Reyes,* 2019 WL 2106422, at *9 (finding that two-plus year gap between conclusion of criminal activity and return of multi-defendant indictment was not inordinate where "investigative work produced extensive documentation that had to be reviewed and analyzed" and included investigation into 19 corporations incorporated by one defendant; further investigation into more than 50 corporations and 50 real estate transactions; and the discovery "exceeded 7,000 pages). Here, the government has not presented evidence or argument showing that the investigation was of similar scope or complexity to other lengthy delays found not to be inordinate due to their intricacies. Indeed, the Court cannot help but wonder if much of the delay in bringing the original indictment was because the government simply left this case on the back burner to sit idle until AUSA Joy was assigned to it. (*See* Tr. 57-58, 125-26.) *See also Strunk v. United States*, 412

U.S. 434, 436 (1973) ("Unintentional delays caused by overcrowded court dockets or understaffed prosecutors are among the factors to be weighed less heavily than intentional delay, calculated to hamper the defense, in determining whether the Sixth Amendment has been violated but . . . they must 'nevertheless . . . be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.'" (quoting *Barker*, 407 U.S. at 531). The upshot, then, is the pre-indictment delay in this case was at least borderline inordinate, and the Court considers it in determining how heavily to weigh the post-indictment delay. Incorporating that period into the total, then, the period of delay is nearly seven years. And given the length of time, the Court finds that the length of delay weighs heavily against the government. The Court therefore turns to the next *Barker* factor.[17]

_____

[17] To the degree that Defendants argue that the length of delay is determinative in this case, and that the Court's analysis should stop here, the Court disagrees. In *United States v. Lamb*, a district court found that an approximate five-year pre-indictment delay caused the defendant actual prejudice by impairing his defense, and the defendant argued that the prejudicial pre-indictment delay coupled with the post-indictment delay of ten months caused him actual prejudice. 214 F. App'x at 914. The Eleventh Circuit disagreed, explaining that "it does not follow that we analytically transfer the actual prejudice, *in toto*, from the pre-indictment delay to the post-indictment delay in our assessment of the fourth *Barker* factor." *Id.* The court went on to consider the four *Barker* factors and found that they did not support a Sixth Amendment violation. *Id.* If a showing of actual prejudice due

## 2.    Reasons for the Delay

Under the second *Barker* factor, the Court evaluates the reasons for the delay, which the government bears the burden of establishing.  *Villarreal*, 613 F.3d at 1351.  In conducting the analysis, the Court allocates different weight to different reasons for delay:

> (1) a deliberate attempt to delay the trial in order to hamper the defense is weighted heavily against the government; (2) a more neutral reason such as negligence or overcrowded courts is weighted less heavily against the government but nevertheless is considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant; and (3) a valid reason, such as a missing witness, serves to justify appropriate delay.

*Id.* (cleaned up) (quoting *Barker*, 407 U.S. at 531).

In this case, there are four principal periods of potential delay at issue:  (1) the time period between the alleged criminal acts and the return of the initial indictment in November 2017; (2) the period between the return of the initial

_____

to five-year pre-indictment delay was not outcome determinative there, it follows that that the pre-indictment delay in this case, which was shorter and did not actually prejudice Defendants, does not compel a finding that Defendants suffered real prejudice  from post-indictment delay.  Thus, the Court must evaluate the remaining *Barker* factors to determine whether Defendants' speedy trial rights have been violated.  *See United States v. Beltran*, No. 1:13-CR-2-WSD-RGV, 2017 WL 3405464, at *5 (N.D. Ga. Aug. 8, 2017) ("[A] pre-indictment delay when tacked onto post-indictment delay is not alone sufficient to find a Sixth Amendment speedy trial violation.").

28

indictment and the return of the superseding indictment in November 2018; (3) the period between the superseding indictment's return and Defendants' arrest on March 6, 2019; and (4) the period between Defendants arrest and their initial appearances in the United States in February and March 2020.[18]  Because the reasons for the delay vary between the different time periods, the Court addresses each of them separately.

The reasons for the gap between the criminal activity and the initial indictment in this case weighs against the government, but not heavily.  As just discussed, the government has not explained in detail why it took almost three years to indict Defendants, and the government concedes that the superseding indictment—including its conspiracy charge—could have been obtained earlier. (*See* Tr. 72, 110.)   But contrary to Defendants' assertions otherwise, the undersigned sees no evidentiary basis to depart from this Court's previous finding

---

[18] Though Defendants complain about being detained pending trial following their initial appearances, they do not argue that any delay following their appearances in this District is attributable to the government.  In any event, any delays in bringing this case to trial following their arrival in this District cannot be blamed entirely on the government, as Defendants have filed numerous pretrial motions and due to the COVID-19 pandemic, the Court has had to repeatedly reschedule hearings to accommodate the health and safety of the parties and counsel.  As a result, the reasons for any delay following Defendants' initial appearances in this District do not weigh against the government.

that "Defendants' allegations of a deliberate decision by the United States to delay the indictment to gain a tactical advantage is sheer speculation." [Doc. 187 at 15.] So even attributing the pre-indictment delay to the government, the lack of bad faith means that this factor weighs against the government, but only somewhat.

As for the twelve-month period between the return of the initial and superseding indictments, the government has demonstrated good faith reasons why it took a year to supersede the indictment. Once the government obtained the initial indictment, AUSA Joy worked diligently to assess the materials previously collected in the case and obtain the superseding indictment. The record shows that he continued in earnest to conduct his own review before finalizing the superseding indictment, including: (1) meeting with agents involved in the Chicago investigation in February 2018 to discuss adding Harby Mayor-Mejia and others to a superseding indictment (Tr. 22-25); (2) reviewing expansive discovery from the Chicago agents (Tr. 25); (3) traveling to Bogota in May 2018 to meet with Colombian prosecutors and law enforcement about adding additional defendants, including Duque-Casanova (Tr. 30)[19]; and (4) reviewing additional information

---

[19] The travel arrangements for AUSA Joy and the agents took weeks to finalize because they had to coordinate with their Colombian counterparts and had to obtain authorization and funding from their respective agencies. (Tr. 27-29.)

30

from Colombian officers in the summer of 2018, including wiretap recordings of

various phone conversations (Tr. 30-31).[20]  Then, in September and October 2018,

AUSA Joy went through the United States Attorney's Office internal process for

obtaining indictments, which included completing a prosecution memorandum,

drafting the superseding indictment, and providing his supervisors with

information about each defendant's criminal history and potential sentence if

convicted.  (Tr. 40.)  In the meantime, AUSA Joy worked with OIA to prepare the

paperwork for Defendants' extradition once they were arrested in Colombia.  (Tr.

38.)  Viewing this period of time and AUSA Joy's conduct as a whole, the

government has established good faith reasons for why it took an additional year

to supersede the indictment, and as a result, this period does not weight heavily

---

[20] The wiretap recordings played for AUSA Joy during the May 2018 meetings were in Spanish, and one of the task force officers provided real-time translation.  (Tr. 30.)  Rather than rely on verbal translation to make prosecuting determinations, AUSA Joy asked for a copy of the recordings so he could have them translated into English.  (Tr. 30-31.)  The Colombian officers provided a disc to AUSA Joy in Bogota, but the disc did not work, so another one was made and sent to AUSA Joy after he had returned to the United States.  (Tr. 32.)  It was August 2018 before the government became to receive translations of the wiretaps to review.  (Tr. 32.)  AUSA Joy also asked for recordings regarding Mayor-Mejia, but the Colombian government insisted on receiving a copy of an MLAT because Mayor-Mejia had originally been a target of the Chicago investigation.  (Tr. 30-32.)

against the government.  *See United States v. Jimenez*, 756 F. App'x 933, 938 (11th Cir. 2018) (finding that government's continued investigation following indictment weighed "only slightly against" the government because the delay was not attributable to bad faith).

Next, for the five-month period between the return of the superseding indictment and Defendants' arrests, the government has provided evidence that it worked diligently to further its prosecution of Defendants.  On November 8, 2018—within a week of obtaining the superseding indictment—the OIA submitted a request for provisional arrest.[21]  (Tr. 43.)  According to AUSA Joy, he and the OIA reviewers were "pulling all-nighters in order to try to get the paperwork done as fast as possible," and on November 29, the Department of State sent the requests for provisional arrest to the United States Embassy in Colombia.  (Tr. 43-44.)  The Embassy then presented the provisional arrest requests to the Colombian government on December 13.  (Tr. 44.)  Once the provisional arrest warrants were

---

[21] Defendants assert that the government "could have started the extradition process in October of 2017, but chose not to."  [*See* Doc. 213 at 9.]  But the government has provided a good faith reason for not commencing the extradition process at that point—*i.e.*, initiating extradition proceedings prior to obtaining the final indictment would have been premature, as the rule of specialty generally bars the government from superseding charges following a defendant's extradition.  (Tr. 112, 114-15, 129-30.)

in place in late January 2019, AUSA Joy learned from OIA that United States law enforcement could work with their Colombian counterparts to arrest Defendants. (Tr. 44; Gov't Ex. 10.)  Colombian and American law enforcement then planned and executed the simultaneous arrests of Defendants in Cali, all within six weeks of AUSA Joy learning that American agents could proceed to work with the Colombian government.  (Tr. 45-47.)  Under these circumstances, it cannot be said that the government acted in bad faith, or even negligently, during this time period. Thus, the reasons for this delay weigh only slightly against the government.

Finally, the one-year delay between Defendants' arrest on March 6, 2019, and their initial appearances in this District cannot be attributed to the government. Defendants argue that the United States government is responsible because it did not do enough to accelerate the extradition process.  On this point, Gilberto Lopez-Giraldo argues that AUSA Joy did not fill out the necessary affidavit to begin the extradition process until April 9, 2019 (a month after Defendants' arrest), despite having the necessary documentation since October 2017.  [Doc. 213 at 9.] Meanwhile, Escobar and Raul Lopez-Giraldo argue that the government is on the hook for this delay because, as Rincon testified, she did not receive a copy of the superseding indictment until June 2019.  [Doc. 216 at 15 (citing Tr. 228-29); Doc.

217 at 17 (same).]  Defendants also point out that Rincon contacted AUSA Joy to attempt to expedite the case and that she specifically told him that Defendants were interested in coming to the United States to address the allegations against them. [Doc. 213 at 10; Doc. 216 at 16; Doc. 217 at 18.]  Duque-Casanova, then, argues that AUSA Joy was aware that Defendants were keen to waive extradition, but "failed to follow-up on this information."  [Doc. 215 at 15.]  Gilberto Lopez-Giraldo similarly argues that the United States should bear the blame for the period during which Defendants were awaiting extradition because Rincon told AUSA Joy that "her clients wanted to come to the United States quickly to resolve their case" and that AUSA Joy "assured" Rincon that "he would send agents to get the process started."  [Doc. 213 at 10.]

The Court disagrees.  To start, the United States government had sixty days after Defendants' arrests to provide the extradition paperwork to the Colombian government, so the fact that AUSA Joy swore out an affidavit in support of a request for extradition a month after Defendants' arrests does not undermine the government's contention that it was acting diligently to secure their extraditions. Likewise, Defendants' contention that Rincon did not have a copy of the superseding indictment prior to June 2019 says nothing about the government's

34

diligence in extraditing Defendants. She and her clients knew that they were charged with criminal offenses pending in the United States, and there is no indication that Rincon—an experienced criminal lawyer and wife to one of the Defendants—ever attempted to obtain a copy of the charging document before then. What's more, Rincon has offered nothing to suggest she ever requested one from the United States government or that the United States government somehow stymied her attempts to obtain a copy before she in fact received one from the Colombian Supreme Court of Justice. More generally, though, Defendants' insinuation that AUSA Joy had control over the extradition process is wholly unsupported by the record. They point to no evidence that suggests that AUSA Joy, or any other representative of United States government, had power to expedite the proceedings in Colombia, nor even that AUSA Joy promised them he could or would do something to shorten their time in Colombian custody. Indeed, Rincon admitted that AUSA Joy told her that "*he had nothing to do with the speed of the extradition*," and that he could only send agents to Colombia to speak to

Defendants so that once they arrived in the United States the proceedings would move more quickly.  (Tr. 245 (emphasis added).)[22]

And Defendants themselves are not without some responsibility for the delay in this instance.  During the entire period during which Defendants were in Colombian custody, they were represented by Rincon, who had experience handling extraditions (Tr. 209, 233), and she testified that her clients could have requested waiver of extradition "at any time" (Tr. 243).  Rincon did not, however, file petitions to expedite the extradition proceedings for nearly seven months.  (Tr. 213.)  And even when the petitions were filed in October 2019, Rincon still did nothing to follow up on the waiver requests, not even when she admittedly grew concerned that the Colombian government was moving too slowly in January 2020.  (Tr. 213, 249-250, 252.)  The United States government, and AUSA Joy in particular, did not interfere with Defendants' ability to expedite extradition.  If anyone bears the blame for the length of time that Defendants spent awaiting extradition, it is Defendants, not the United States government.

---

[22] Duque-Casanova vaguely grouses that the United States government "should have done further inquiry on extradition proceedings" [Doc. 215 at 15]; however, he does not point to any particular steps the government could have taken in these circumstances.

In sum, the second *Barker* factor—the reasons for the delay—weighs only slightly against the government when viewed in totality.  Although the government has not explained in sufficient detail why it waited so long to bring the first indictment; there is no evidence to support the notion that the government delaying bringing these charges in bad faith or to obtain a strategic advantage over Defendants.  As to the post-indictment period in this case, the government has provided a sufficient explanation for the delays.  Starting from the time that AUSA Joy got involved in the case, the government acted diligently to supersede the indictment and work with the Colombian authorities to arrest and extradite Defendants.  Further, any delay during the period Defendants spent in Colombian custody awaiting extradition cannot be attributed to the United States government when Defendants themselves—who were at all times represented by experienced counsel—failed to request that Colombian government expedite their extradition.  Accordingly, this factor weighs against the government by only a slim margin.

### 3.    Defendants' Assertion of Their Speedy Trial Right

The third *Barker* factor—Defendants' assertion of their speedy trial right— is a mixed bag.  On the one hand, Defendants were unaware of the charges against them prior to their arrests in March 2019, and, therefore, their failure to make a demand for a speedy trial before then cannot be counted against them.  *See*

*Villarreal*, 613 F.3d at 1354 ("[A] . . . defendant's 'failure to make a demand can hardly be counted against the defendant during those periods when he was unaware that charges had been lodged against him.'") (quoting 5 Wayne R. LaFave, *et al.*, Crim. Proc. § 18.2(d)).  Defendants also timely filed the instant motion to dismiss, clearly asserting their right to a speedy trial. [*See* Doc. 101.] *See also United States v. Cruz*, 681 F. App'x 819, 823 (11th Cir. 2017) (finding that the third *Barker* factor weighed heavily against the government when the defendant was unaware of the indictment until his arrest and moved to dismiss the indictment for post-indictment delay); *United States v. Spaulding*, 322 F. App'x 942, 947 (11th Cir. 2009) ("[I]f the defendant did not learn about the indictment until his arrest, and afterwards promptly asserted his speedy trial right, then this factor weighs heavily against the government." (citation omitted)).  To some extent, then, this factor weighs against the government.

But on the other hand, once Defendants were arrested in Colombia, they failed to diligently pursue extradition.  To recap, Defendants were represented by Rincon at all times after their arrests on March 6, and could have filed a petition for expedited extradition at any time, but did not.  (*See* Tr. 243.)  And despite telling AUSA Joy that her clients wanted to come to the United States to answer the

38

charges, she waited nearly half a year to file the petitions, and then took no action to speed the process, even when she grew concerned about the length of the delay in January 2020.  (Tr. 249, 255.)

Balancing these countervailing considerations, the Court finds that this third *Barker* factor weighs somewhat against the government.  While Defendants' delay in demanding expedited extradition contributed to the post-indictment delay, they cannot be faulted for not demanding a speedy trial prior to their arrests, and they in fact timely filed their motion to dismiss once they arrived in this District. Accordingly, this factor weights against the government, but only moderately.  *See United States v. Waked Hatum,* No. 15-20189-CR, 2017 WL 3172824, at *7 (S.D. Fla. July 25, 2017) (finding that the third *Barker* factor weighed against the government even though the defendant contributed to the delay of his extradition from Colombia by filing an unnecessary motion for clarification).  And because this factor does not weigh heavily against the government, the Court must evaluate the fourth factor—whether Defendants suffered actual prejudice by the delay.  *See Villarreal*, 613 F. 3d at 1355; *Jimenez*, 756 F. App'x at 939 ("When the reasons for the delay do not weigh heavily against the government, the defendant is not excused from showing actual prejudice.") (cleaned up).

39

### 4.    Actual Prejudice

Finally, the Court assesses the fourth *Barker* factor, actual prejudice, "in light of the three interests of the defendant the speedy trial right was intended to protect:  (1) 'to prevent oppressive pretrial incarceration;' (2) 'to minimize anxiety and concern of the accused'; and (3) 'to limit the possibility that the defense will be impaired.'"  *Villarreal*, 613 F. 3d at 1355 (quoting *Barker*, 407 U.S. at 532).

While each Defendant offers his own explication of the prejudice suffered in this case, there are broad similarities between their arguments that focus on the three areas of concern identified above.   Duque-Casanova argues that he has suffered actual prejudice because he has been in custody for over two years; the conditions at the La Picota prison in Colombia were horrid; following his arrival to the United States, he suffered from anxiety over and ultimately contracted COVID-19; and due to the passage of time, the loss of business records, and the death of Lozado-Franco, his ability to prepare a defense has been impaired.  [Doc. 215 at 16-17.]  Raul Lopez-Giraldo and Escobar similarly argue that they suffered from oppressive pretrial incarceration while awaiting extradition in Colombia; that their pretrial detention in the United States has also been oppressive because of the COVID-19 pandemic and because they have been unable to visit family; and that due to the passage of time, records and witnesses are either unavailable or hard to

40

locate.  [Doc. 216 at 17-19; 217 at 19-21.]  Gilberto Lopez-Giraldo, meanwhile, focuses on the purported loss of evidence, contending that "there is no reasonable way for [him] to offer evidence or witness testimony to show the length of delay deprived him of tangible evidence to prove the delay prejudiced his defense because the delay itself is what deprives him of the tangible evidence."  [Doc. 225 at 2.]

Turning to the first type of prejudice—oppressive pretrial incarceration—the Court starts with Defendants' arguments about the conditions at La Picota.  It is undisputed that the conditions at La Picota are deplorable: it is overcrowded and filthy, detainees lack access to personal hygiene items, the food is inedible and the portions inadequate, and the guards are aggressive with inmates.  (Tr. 230-31; Def. Ex. 7A [Doc. 200-7].)  But as revolting as those conditions may have been, they cannot be attributed to the United States government.  Defendants were arrested in Colombia because that is where they resided at the time of their arrests.  And they were not in Colombia because of anything the United States government did.  Accordingly, the conditions of Defendants' incarceration in Colombian prison are insufficient to show actual prejudice warranting dismissal.  *See Waked Hatum*, 2017 WL 3172824, at *7 (finding that oppressive conditions of confinement in

Colombia did not give rise to actual prejudice because "the Government did not force or encourage [the defendant] to travel to Colombia") (citing *United States v. Mitchell*, 957 F.2d 465, 469 (7th Cir. 1992)).

As for Defendants' incarceration in the United States, Defendants have not demonstrated that their detention here has been "oppressive" for purposes of showing actual prejudice.  While the Court does not doubt that Defendants miss their families and have had reasonable concerns about the COVID-19 pandemic, they have not shown that these unpleasant byproducts of pretrial detention were somehow avoidable or the result of substandard conditions, which is insufficient to establish actual prejudice.[23]  *See United States v. Villalobos*, 560 F. App'x 122, 127 (3d Cir. 2014) (finding that defendant did not establish actual prejudice based on oppressive pretrial incarceration where he did not show "sub-standard conditions of imprisonment that would render it oppressive"); *see also United States v. McRae*, No. CR 119-125, 2021 WL 359258, at *4 (S.D. Ga. Jan. 19, 2021) (stating that defendant's contentions that his pretrial incarceration deprived him of access to

---

[23] Raul Lopez-Giraldo states in his brief that during his pretrial detention in the United States, his father passed away due to COVID-19.  The Court sympathizes with his loss; however, the passing of everyday milestones—good or bad—while a defendant is in custody does not render pretrial detention oppressive.

adequate sunlight, caused him to breathe stale air, and put him at greater risk of contracting COVID-19, all "describe normal and unavoidable conditions of imprisonment rather than oppressive pretrial incarceration"), *report and recommendation adopted*, 2021 WL 354423 (S.D. Ga. Feb. 2, 2021). Accordingly, Defendants have not shown that their confinement in the United States subjected them to oppressive pretrial detention causing actual prejudice.

Turning to the next type of prejudice, Defendants' feelings of anxiety and concern, there are three time periods at play. First is the delay between indictment and arrest, when they knew nothing of the charges against them. Obviously, Defendants cannot be heard to complain that they suffered any anxiety or concern during that time period. *See Waked Hatum*, 2017 WL 3172824, at *8 (finding that the time between indictment and defendant's arrest did not cause anxiety and concern because the indictment was sealed and defendant was unaware of the proceedings against him). Second is the period that Defendants spent in Colombian custody awaiting extradition. As previously explained, this delay is not attributable to the United States government. Defendants were in Colombia through no doing of the United States; Colombia officials arrested and detained Defendants; and, as discussed above, Rincon admitted that she could have acted to request extradition

at any time, but waited seven months to petition the Colombian government for relief. As a result, this period of delay does not demonstrate actual prejudice caused by the government's delay. The third and final period is the short period of time after their extradition to the United States until they filed their motion to dismiss. And any anxiety and concern that Defendants may have experienced during that period cannot be attributed to a *delay* by United States government; rather, any such feelings would have been caused by any pretrial detention. There is no reason to think that Defendants would have been released on bond pending trial, so regardless of how long it took to arrest and extradite Defendants, they would have been detained pending trial following extradition to the United States. Thus, any anxiety or concern they have is not attributable to the government's delay.

The third and final actual prejudice consideration—the possible impairment of Defendants' defense—also weighs against Defendants for the same reasons discussed in Section II.A. above. The Supreme Court has recognized that the "impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony can rarely be shown." *Doggett*, 505 U.S. at 655 (internal citations omitted); *see also Villarreal*, 613 F.3d at 1356 ("[I]n considering whether [a defendant] suffered actual

44

prejudice, we remain mindful that the passage of time makes it more difficult to demonstrate actual prejudice with complete precision."). And Defendants' generalized assertions about faded memories, lost documents, deceased or unavailable witnesses, and so forth are simply insufficient to meet their burden under this prong. Indeed, in *Villarreal*, the Eleventh Circuit found that a defendant who made an even more particularized showing failed to demonstrate actual prejudice. 613 F.3d at 1356-57. In that case, the defendant identified a specific witness whom he could not locate; presented testimony from his sister concerning her unsuccessful attempts to find documents that supported his contention that he had been running a legitimate business; and specifically pointed to receipt as an exculpatory document that he could not locate; even so, the Eleventh Circuit affirmed the district court's finding that this failed to demonstrate actual prejudice. *Id*. Here, Defendants come forward with even less: they do not identify any particular, potentially exculpatory information that was lost due to the delays in this case; they fail to explain why they cannot access documents relating to their businesses, much less how any delay resulted in that lost access or why those documents would undermine the government's theory of the case; they do not point to any unindicted witness whom they would call at trial but who cannot be located

or cannot remember important information as a result of any delay; and they do not present anything more than speculation that Lozado-Franco, if he were alive, would have assisted them in their defenses. Accordingly, Defendants have not carried their burden to show actual prejudice under this final consideration, or indeed under any of the three.

In conclusion, having balanced the *Barker* factors, the Court finds that because no actual prejudice resulted from the delays in this case, the government did not deprive Defendants of their right to a speedy trial. As a result, Defendants' motion to dismiss for post-indictment delay should be **DENIED**.

## III.   CONCLUSION

For the reasons explained above, it is **RECOMMENDED** that Defendants' Joint Motion to Dismiss Indictment for Pre-Indictment and Post-Indictment Delay and their renewed requests to dismiss for pre-indictment delay be **DENIED**. [Docs. 101, 213, 214, 215, 216, 217.]

It is **ORDERED** that Gilberto Lopez-Giraldo's, Duque-Casanova's and Escobar's motions to withdraw their respective motions to suppress [Docs. 219, 220, 221] are **GRANTED** and their motions to suppress [Docs. 104, 108, 116], are **WITHDRAWN**.

46

Finally, pending before the Court are Duque-Casanova and Escobar's motions to sever based on possible *Bruton* problems.[24] [Docs. 107, 114.] Because a *Bruton* problem would not ripen until closer to trial, the motions to sever are **DEFERRED** to the District Judge.

There are no further motions pending before me, and I am not aware of any impediments to the scheduling of a trial.  Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

SO ORDERED and RECOMMENDED this 4th day of November, 2021.

_____
JOHN K. LARKINS III
United States Magistrate Judge

---

[24] In *Bruton v. United States*, 391 U.S. 123 (1968), the Supreme Court held that the admission of a co-defendant's confession at a joint trial violates the defendant's right to confrontation if the confession also incriminates the defendant.