IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA    ) | |
| ) | |
| v.              ) | |
| ) No. 1:17-CR-395 (MLB)- (04) | |
| ) | |
| GUILLERMO ESCOBAR     ) | |
| _____ ) | |

**SENTENCING MEMO**

COMES NOW GUILLERMO ESCOBAR, by and through counsel, and files this memo to be considered by this Honorable Court in conjunction with his Presentence Report and all argument, evidence and allocution to be put forth at his sentencing hearing currently set for Wednesday, July 13, 2022, in Atlanta, Ga. Mr. Escobar asks that this information be used to fashion a sentence which comports with the requirements of 18 U.S.C. §3553(a) and which is otherwise reasonable. In accordance with the plea agreement, Mr. Escobar requests a sentence no longer than 63 months.

*Introduction:* GUILLERMO ESCOBAR is a 54 year old citizen and resident of Columbia who has pled guilty to one count of money laundering conspiracy (Count 5). The conduct in this case occurred at various times between 2010-2014. Mr. Escobar was arrested in Columbia on March 6, 2019, and held

under miserable conditions at the infamous La Picota Prison.



**(La Picota Prison, Columbia)**



**(Human Rights' protest banners at La Picota)**

The U.S. government extradited Mr. Escobar in February of 2020. Since arriving in Atlanta and being held at the Robert A. Deyton Detention Center, Mr. Escobar has been hospitalized three (3) times with the COVID-19 virus. (PSR ¶ 114). He suffers from residual effects of COVID including joint pain, frequent urination, insomnia and difficulty concentrating. He has aged tremendously.

The past three years also have been very rough on Mr. Escobar's family. His 12-year old daughter has become depressed and at times suicidal. His 3-year old son barely knows him. (PSR ¶ 110). His romantic partner, Carolina Andrea Cordoba, desperately needs Mr. Escobar home as soon as possible to help her raise, love and support their children.



**(Mr. Escobar and his family in 2019, see "Exhibit 1").**

I)  **SENTENCING GUIDELINE ISSUES**.

**(A)** *Being "in the business" of money laundering*.  (PSR Paragraph 88).

Under the facts of this case, the 4 level enhancement under USSG §2S1.1(b)(2)(C) should not be applied to Mr. Escobar.  Furthermore, application of this proposed enhancement is troubling given the delay in bringing this prosecution and the place of prosecution (Atlanta), with the alleged conduct occurring in Columbia.  Mr. Escobar worked in Columbia as a swimming coach and fitness instructor. (PSR ¶¶ 118,122).  (*See* Certificates, "Exhibit 2").  For a time, he also operated a store in the El Diamante Mall.  His store sold cell phones and electronic accessories, greeting cards, Christmas ornaments and other miscellaneous goods.  Mr. Escobar is prejudiced in disputing and disproving the allegation that he was "in the business" when his store closed down approximately 7 years ago, and the records and witnesses to his legitimate business activities are long gone and beyond the reach of counsel and the Court.  Furthermore, it is the government's burden to meet the criteria for this proposed 4-level enhancement.

As counsel for codefendant Gilberto Lopez-Giraldo has noted, The application of U.S.S.G.§ 2S1.1(b)(2)(C) is determined by considering the "totality of the circumstances." *See* <u>Application Notes</u> to §2S1.1(b)(2)(C).  The six factors listed are - whether the defendant (1) regularly engaged in laundering funds; (2)

laundered funds for an extended period of time; (3) laundered funds from multiple sources; (4) generated a substantial amount of revenue in return for laundering funds; (5) had a prior conviction for a money laundering related offense; or (6) made statements during the course of an undercover government investigation that he had engaged in any of the conduct listed in factors (1) (2), (3), or (4). U.S.S.G. § 2S1.1 cmt. n. 4 (B).

There is insufficient evidence before the Court that Mr. Escobar knowingly laundered funds from multiple sources. Everything Mr. Escobar did in this case, he did from Columbia. He never set foot in the United States. Although he was in the laundering "loop" for funds both in Atlanta and Chicago, the PSR makes clear that Mr. Escobar was operating in Columbia under the direction and control of Juan Pablo Lozada. In short, almost all the funds Mr. Escobar conspired to launder came from or through the same source, Pablo Lozada. Typically, Lozada was the boss with the contacts and the "contracts." Mr. Escobar did not have the "contracts," he did on occasion purchase "sub-contracts" from Lozada or his codefendants, "*Los Monos*." (PSR ¶¶ 25,33,41,51). There is no evidence Escobar generated substantial revue, and he does not have a prior conviction for money laundering. Relative to the context of the charged conspiracy, he did not regularly engage in laundering funds or do so for an extended period of time.

As counsel for Alexander Duque-Casanova has pointed out, the "business of laundering" enhancement was added to the Sentencing Guidelines in 2001 through Amendment 634. The Sentencing Commission analogized the business of laundering to a "professional fence." *See* U.S.S.G. App. C, amend. 634 ("[S]imilar to a professional 'fence,' … defendants who routinely engage in laundering funds on behalf of others, and who gain financially from engaging in such transactions, warrant substantial additional punishment because they encourage the commission of additional criminal conduct.") Courts have adopted the "professional fence" analogy from the Commission's commentary in both published and unpublished opinions. See, e.g., *United States v. Mitchell*, 613 F.3d 862 (8th Cir. 2010); *United States v. Lazo*, 491 F. App'x 942, 944 (11th Cir. 2012). To be "regularly engaged," the activity must be more than "isolated, casual or sporadic." *United States v. Tabares*, 2021 U.S. App. LEXIS 33619; 2021 WL 5279404 (11th Cir. 2021).

While the evidence against Mr. Escobar was sufficient to prove his role in a conspiracy, the government has no evidence that he received "substantial revenue." This conduct is similar to that in *United States v. Quarshie*, No. 04 CR. 1148-5, 2007 U.S. Dist. LEXIS 5457, 2007 WL 107754, *1-3 (S.D.N.Y. Jan. 16, 2007), where the defendant was held to not be in the business of laundering funds

when she received only $4,000 from laundering $100,000 for one person.

Cases applying the enhancement have involved far more in "substantial revenue":

- $1.175 million used to purchase a yacht (*United States v. Lucena-Rivera*, 758 F.3d 435 (1st Cir. 2014));

- An estimated $47,613 (*United States v. Lazo*, 491 F. App'x 942 (11th Cir. 2012));

- $17,000 (*United States v. Tabares*; 2021 U.S. App. LEXIS 33619; 2021 WL 5279404 (11th Cir. 2021));

- At least $334,493 in kickbacks (*United States v. Aguasvivas-Castillo*, No. 07-0111CCC, 2010 U.S. Dist. LEXIS 20011, 2010 WL 883719, *2 (D.P.R. Mar. 5, 2010));

- $15 million in deposits (*United States v. Hosseini*, No. 05 CR 254, 2007 U.S. Dist. LEXIS 73256, 2007 WL 2904015, *2 (N.D. Ill. Oct. 1, 2007));

- $42,000 (*United States v. Mitchell*, 613 F.3d 862, 869 (8th Cir. 2010) (remanding to clarify whether the $42,000 figure was accurate, in which case the enhancement would apply, or $2,250-to- $4,500, in which case it would not)).

Under the totality of the circumstances, there is insufficient evidence to support the proposed 4-level enhancement for Mr. Escobar being "in the business of laundering funds." To the extent that any such evidence exists, Mr. Escobar's culpability for such is more than adequately accounted for in the Base Offense Level and the 14-level increase for the value of the laundered funds.

(B) **KNOWLEDGE OF DRUG PROCEEDS.**  (PSR Paragraph 87).

Under the facts of this case there is insufficient evidence to support the 6-level enhancement under USSG §2S1.1(b)(1)(B).  Admittedly, Mr. Escobar is from Columbia and he has a prior conviction for distributing a kilo of cocaine.  (PSR ¶100).  However, this does not mean he knew or believed the funds laundered in *this* case through the Black Market Peso Exchange (BMPE) were drug proceeds.  Paragraph 19 of the PSR reveals the following:

> Colombian individuals or corporations who have pesos to sell, **whether from legitimate sources or not**, and want to exchange pesos for dollars in a manner that avoids Colombian currency exchange and income reporting requirements and the payment of Colombian taxes, tariffs, and duties owed to the Colombian government, then make arrangements with the peso broker.

(PSR ¶ 19)(emphasis added).

Again, everything Mr. Escobar did in this case, he did in Columbia.  Furthermore, when asked to mix money laundering with drug dealing in an undercover sting operation in Chicago, Mr. Escobar explicitly refused and stated he keeps such activities separate, that he intentionally avoided *"mixing one with the other."* (PSR ¶ 37).  There is no evidence Mr. Escobar completed any such

8

proposed drug deals in Chicago, furthermore, this statement reveals that he intentionally avoided knowingly laundering drug proceeds.

As counsel for Alexander Duque-Casanova has noted, whether a defendant "knew or believed" the laundered funds were drug trafficking proceeds does not turn on the objective characteristic of the funds, but rather upon the subjective knowledge or belief of the defendant. *United States v. Payne*, 962 F.2d 1228, 1235 (6th Cir. 1992); *United States v. Mitchell*, 613 F.3d 862 (8th Cir. 2010). The desire to use the BMPE is often an attempt to conceal transactions to avoid taxes, tariffs, or duties. (*Id*.). Thus, it cannot be the case that every person involved in a BMPE knows that the proceeds are drug related. There must be something more. Simply tying the funds to Colombia is not enough to warrant this enhancement. Though Colombia is known as a source country for cocaine, imputing knowledge based solely on negative stereotypes and generalizations about particular groups is inappropriate. In *United States v. Gamez*, 1 F. Supp. 2d 176, 182 (E.D.N.Y. 1998), the court declined to apply the enhancement (formerly +3) based solely on knowledge that the laundered money was going to Colombia. The court cited research to make clear that there are plenty of non-drug reasons to launder money into Colombia (for example, that Colombian businesspeople employ money

laundering schemes to avoid taxes of 23% to 41%).

Here, the evidence is insufficient to meet the Government's burden to show Mr. Escobar knew or believed the laundered funds were drug proceeds. Mere speculation on the part of the agents or anyone else is insufficient to prove this enhancement.

**II) REQUESTS FOR A REASONABLE AND LOWER SENTENCE:**

As authorized by Title 18 USC § 3553 (a) and *United States v. Booker*, 125 S.Ct. 738 (2005), Mr. Escobar requests a reasonable sentence lower than the advisory guidelines. After considering the Guidelines, "the District Court may impose a more severe or more lenient sentence as long as the sentence is reasonable." *United States v. Crawford*, 407 F.3d 1174, at 1179 (11th Cir. 2005). A below-Guidelines sentence is assessed for reasonableness in light of the factors set out at 18 U.S.C. §3553(a). "These factors include available sentences, the applicable Guideline range, the nature and circumstances of the offense, and the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and provide the defendant with needed medical care." *United States v. Winingear*, 422 F.3d 1241, 1246 (11th Cir.

2005).

## A) THE NATURE AND CIRCUMSTANCES OF THE OFFENSE.

Obviously, the nature of the offense is serious. On one hand, money laundering through the Black Market Peso Exchange allows other criminal acts and schemes to flourish and avoid detection. However, this was a non-violent offense conducted by Mr. Escobar and his codefendants, who sent text messages and emails containing bank account information for cash deposits.

## B) THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT.

Mr. Escobar has one prior conviction from twenty (20) years ago. (PSR ¶100). This places him in Criminal History Category II. After being deported upon completion of his 2002 sentence, Mr. Escobar remained in Columbia. While some of his time was consumed by the crime in this case, the majority of his time and Life was spent raising his children and coaching swimming. He is a good man and a loving father. Clearly his young children need him home, back in Columbia, as soon as possible. Mr. Escobar's partner, CAROLINA CORDOBA, writes the following:

I would like to inform who it may concern that I am his life companion and the mother of his two children, the children of Mr. Guillermo Escobar Gallego . . . .

I would just like to ask you as the mother and life companion of almost 14 years for the forgiveness for my Guillermo.

I am alone in raising his children and my youngest son is growing without the paternal figure of his father. My oldest daughter has suffered many episodes of depression because of the absence of her father but also because of the absence of that same man who was her best friend he is everything to her. Ladies and gentlemen of the jury, my husband has been an excellent father for his daughter Zara Escobar.

She is a wonderful child but it has been very difficult for her to suffer the absence of her father. I pray and beg to God that you will allow Guillermo to come back home soon. I can assure you that Guillermo has been an exemplary model to his daughter because our son was only four months old when he had to leave our home.

He is imperfect as all human beings are, but God loves him because he is a son of God. Allow him to be back home and with his family because we need him so much. God bless your hearts and may your souls be touched. Look on my husband in the light of mercy.

(Letter from Carolina Cordoba, "Exhibit 3").

Mr. Escobar's parents submit the following:

> Our son Guillermo is a professional who graduated from a college in Cali, Colombia. He is active in sports, specifically in the discipline of swimming, as he is an instructor in this activity. He has represented the city of Cali in Colombia as well as in other groups.
>
> He does not drink alcohol, he does not smoke, and he has healthy habits. He is a good son and he has always been attentive to our needs, since we are senior citizens, and have been married for fifty-four years.
>
> My son, Guillermo Escobar Gallego, has two children of his own. A girl who is thirteen years old, and a little boy who is three years old. They suffer much because of his absence, and wish to be with him.
>
> We belong to the Seventh-Day Adventist Church, so we have taught our son Christian values.
>
> Dear Judge, please consider all of these facts that may help in the quick return of our son, to bring him back to his children that are in such need of him.
>
> Dear Judge, we can assure you, as the Christians that we are, that our son is a good man. He is a good father, affectionate, and respectful of our laws in Colombia.

>I, Guillermo Escobar Senior, am seventy-eight years old, and my wife, Nidia Gallego de Escobar, is seventy-four years old. I am retired from the National Police of Colombia, where I worked for twenty-two years. We need our son back home soon, Judge.
>
>We thank you in advance for your attention and your time.

(Letter from Guillermo Escobar Gomez and Nidia Gallego de Escobar, "Exhibit 4").

***The Conditions at La Picota Prison and the COVID Conditions at RAD Support a Downward Variance.***

Like his codefendants, Mr. Escobar spent almost a year in La Picota Prison awaiting extradition. Renowned for its inhumane conditions, La Picota is situated in southern Bogota. The prison was built to house Columbia's most violent criminals as well as Colombian citizens awaiting extradition. The cells are "open air" cells meaning that the inmates are subjected to the near-freezing temperatures and torrential downpours of the Bogota mountains. The hygienic conditions of the prison are deplorable. Sewers often overflow. Food is served uncooked and often insect infested. Hot water is often shut off. Medical attention is scarce. The conditions are so horrific that the prisoners filed suit against the INPEC (Colombia's BOP) for human rights abuses. Yet nothing has been done to

14

ameliorate the conditions of the prison. La Picota has been the topic of several media stories shedding light on the inhumane treatment of the inmates housed there. *See, e.g.,* Juan David Moreno Barreto, *S.O.S. sanitario desde la carcel la Picota*, El Espectador, (March 26, 2019, 1:53 PM), (noting the deplorable conditions at La Picota Prison).

While conditions at the Robert A. Deyton Detention Center are better than La Picota, the COVID pandemic has made Mr. Escobar's stay often miserable and at times life-threatening. He has been hospitalized three (3) times with COVID. He was quarantined several times. He has lost a lot of weight and he suffers from residual symptoms including joint pain, frequent urination, insomnia and difficulty concentrating. He has aged tremendously.

Additionally, Mr. Escobar is a Colombian national without status in the United States. As such, he is not eligible for more lenient confinement during the last 10% of his sentence, such as time in a half-way house, nor is he eligible for assignment to a minimum-security facility or camp, and he cannot work in the federal prison industries. *See* BOP Program Statement # 7310.04, pp. 10; https://www.bop.gov/policy/progstat/5100_008.pdf. The Biden Administration recently announced it was considering using its clemency power under the CARES

Act for early release of non-violent drug offenders. Unfortunately, this program, like many of its kind, would only apply to U.S. citizens. Mr. Escobar cannot take advantage of this or any of the new programs contained in the First Step Act to reduce his sentence simply because he is not a U.S. citizen. At the conclusion of his sentence, Mr. Escobar will be sent to an Immigration facility for an unspecified amount of time while the United States arranges for his deportation to Colombia. There is no way to determine how long Mr. Escobar will remain in Immigration custody. Deportation officers typically wait until there is a sufficient number of individuals of the same nationality before organizing the return flight to make the return cost effective.

Courts in various circuits have ruled that such a prospect of "objectively more severe conditions based solely on alienage" warrants a downward departure or variance. *See, e.g., United States v. Navarro-Diaz,* 420 F.3d 581 (6th Cir. 2005)(illegal reentry case remanded in light of *Booker* where district court noted defendant would be punished more than a citizen due to ineligibility for six months half way house at end of term); *United States v.. Cardosa-Rodriguez*, 241 F.3d 613 (8th Cir. 2001); *United States v. Davoudi*, 172 F.3d 1130 (9th Cir. 1999) (ineligibility for minimum security designation of up to 6 months of home

confinement authorized by 18 U.S.C. § 3624(c) can justify departure); *United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994)(establishing a precedent of an automatic six-month variance for aliens in the D.C. Circuit); *United States v.. Pacheco-Soto*, 386 F.Supp 2d 1198 (D.N.M. 2005)(deportable alien convicted of drug crime sentenced to 60 months, rather than minimum guideline term of 74 months, in light of his ineligibility for early release, minimum security prison, or credits for participation in residential drug or alcohol abuse program). Here, a variance is warranted to compensate for the collateral consequences Mr. Escobar faces as an incarcerated alien.

WHEREBY, based upon the above, GUILLERMO ESCOBAR requests that this Honorable Court grant his objections to the PSR, grant him downward

variance and impose a reasonable sentence no longer than 63 months.


Dated:  This 6th day of July, 2022.


Respectfully submitted,


*L. Burton Finlayson*

_____
L. BURTON FINLAYSON
Attorney For GUILLERMO ESCOBAR
Georgia Bar Number: 261460


LAW OFFICE OF
L. BURTON FINLAYSON
ATTORNEY AT LAW
931 Ponce de Leon Avenue, NE
Atlanta, Georgia 30306
(404) 872-0560
LBFCOURTS@aol.com

# CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing Sentencing Memo upon the following:

>Nicholas Joy
>
>Assistant United States Attorney
>
>600 U.S. Courthouse
>
>75 Ted Turner Drive, S. W.
>
>Atlanta, Georgia  30303

by CM/ ECF delivery.

>DATED:  This 6th day of July, 2022.

>*L. Burton Finlayson*
>
>_____
>
>L. BURTON FINLAYSON
>
>ATTORNEY FOR GUILLERMO ESCOBAR
>
>State Bar Number: 261460